J. Robert Lynch, J.
The within motions to inspect the minutes of the extended May 1960 Grand Jury of Onondaga County were separately argued and submitted but present, in part, a common question of law on the legality of wire-tap evidence as it stands at this particular moment of time. A review of the law on the subject is necessary to an understanding of the motions and to their decision.
Federal law (the Federal Communications Act, U. S. Code, tit. 47, § 605) prohibits the divulging of communications without the permission of the sender.
State law (N. Y. Const., art. I, § 12; Code Crim. Pro., § 813-a) permits the interception of telephone communications to test a reasonable belief that evidence of crime may be obtained.
These apparently contradictory enactments have engendered considerable judicial interpretation with a pattern of reasoning clearly discernible.
In Nardone v. United States (302 U. S. 379, decided Dec. 20, 1937) the Supreme Court of the United States determined that section 605 of the Federal Communications Act rendered inadmissible in a criminal trial in Federal court evidence of Federal officers of an interstate communication intercepted by a wire tap. Inadmissibility was extended to intrastate communications by. Weiss v. United States (308 U. S. 321, decided Dec. 11, 1939).
Presumably giving expression to the policy in this State of admitting evidence having probative force even though illegally obtained (People v. Richter’s Jewelers, 291 N. Y. 161, 165; for a history of this policy, and an argument against it, see Tainted Evidence — An Argument for Exclusion, 24 Albany L. Rev. 392, June, 1960), the Court of Appeals of New York held wire-tap evidence admissible in State courts despite the argument that it violated section 605 of the Federal Communications Act (People v. Stemmer, 298 N. Y. 728, decided Nov. 24, 1948, affd. by an evenly divided court 336 U. S. 963).
At this juncture, the question was posed whether or not action might lie in Federal court to enjoin criminal actions in State courts. The answer was given generally without reference to wire-tap evidence, and injunction denied, in Stefanelli v. Minard (184 F. 2d 575, decided Oct. 31,1950). There, the United States Court of Appeals for the Third Circuit said (p. 576), “ Every question here raised by the appellants can be asserted by them in the New Jersey State Courts and the way to the Supreme Court of the United States is open. Federal courts should not enjoin criminal proceedings in state courts save in exceptional *1052 cases to prevent irreparable injury which is clear and imminent.” This judgment was affirmed (342 U. S. 117).
In a case decided on December 15, 1952 (Schwartz v. Texas, 344 U. S. 199), the Supreme Court of the United States, assuming section 605 of the Federal Communications Act to have been violated (p. 201), upheld a conviction obtained in a State court through the use of wire-tap evidence obtained by State Police officers. The court, in not excluding such evidence in State courts, reaffirmed its position that section 605 excludes it in Federal courts.
■In 1956 the injunction-through-Federal-court method, ruled upon broadly in Stefanelli (supra), was particularized to wiretap evidence. Voci v. Storb (235 F. 2d 48, decided June 13, 1956) presented to the United States Court of Appeals for the Third Circuit the question of restraining two State Police officers and a Commonwealth’s Attorney from using wire-tap evidence obtained by them in any proceeding on the ground that it would be contrary to section 605. In denying the injunction the court said (p. 49), “We are unable to see any distinction between the problem of the propriety of federal intervention at this stage presented in this case and that in Stefanelli v. Minard ’ ’.
Next (1957) came proof of the adage that the law must be flexible to meet constantly changing circumstances. The New York City police suspected Salvatore Benanti of dealing in narcotics contrary to State law. A State court order permitted a telephone he used to be tapped. He was heard to state on the telephone that on a certain night “ eleven pieces ” were to be transported to a certain place. Acting on this overheard conversation, the police found “ eleven pieces ”, but they were not narcotics. They were 11 five-gallon cans of alcohol which did not bear the tax stamps required by Federal law. Benanti was tried and convicted in the United States District Court with the illegal possession and transportation of distilled spirits lacking the required Federal tax stamps. Cross-examinations during the trial revealed that the seizure of the alcohol resulted from the information gained by the wire tap.
The factual situation is a cross mating of the Nardone and Schwartz cases (supra). Might wire-tap evidence be admitted in Federal court for a Federal offense, when it was originally adduced by State officers, on State business, by State court order, and where the wire was tapped without the knowledge or consent of the Federal authorities'?
The Supreme Court of the United States reversed the conviction (Benanti v. United States, 355 U. S. 96, decided Dec. 9, *1053 1957). Going back to the principle of the Nardone case, the court held ‘1 that the correct application of the above principle dictates that evidence obtained by means forbidden by Section 605, whether by state or federal agents, is inadmissible in federal court ” (p. 100).
Any doubts engendered, or hopes kindled, by an overly punctilious reading of the opinion in Benanti that State wiretaps were excluded in State courts were set at rest in People v. Variano (5 N Y 2d 391, decided April 9, 1959). There, the Court of Appeals pointed out that Benanti was expressly not decisive of this factual situation.
The year 1960 saw another application in Federal court to enjoin officers from divulging wire-tap evidence in a State criminal trial when introduction would be violative of section 605 of the Federal Communications Act (Pugach v. Dollinger, 277 F. 2d 739, decided April 14, 1960). Irreparable injury was alleged on the theory that if those seeking the injunction were to be found guilty on the criminal trial, their convictions would not be subject to reversal or appeal either under New York law as expressed in the Variano case, or under Federal law, as expressed in Schwartz v. Texas (supra).
The United States Court of Appeals for the Second Circuit affirmed the judgment denying the injunction, reiterating the position taken in Stefanelli v. Minard (supra) and Voci v. Storb (supra). At the same time it rejected the argument that the principle enunciated in Wolf v. Colorado (338 U. S. 25) was controlling.
On June 27, 1960 the Supreme Court of the United States decided Elkins v. United States (364 U. S. 206). Its holding relates only to Federal courts and would not be mentioned here except that it contains a detailed and statistically bolstered argument for the adoption of the. exclusionary rule by those States which have not already done so.
It has a bearing here in that it may portend things to come since on the same day it was decided, the court granted certiorari in the Pugach case (363 U. S. 836).
On July 12,1960, on application of Pugach, the United States Court of Appeals for the Second Circuit, despite the position it had previously taken, stayed the use of wire-tap evidence obtained by State officers, in a State criminal court pending final determination of the matter in the Supreme Court of the United States (280 F. 2d 521). It assumed power to do so under the authority, applicable to a limited class of cases, to ‘ ‘ if the purposes of justice require, preserve the status quo until decision by the appellate court ” (pp. 522-523).
*1054 Thus, limited in time and scope, has the exclusionary rule come to the State of New York.
A salient point common to the within motions is the desire of the defendants to inspect the Grand Jury minutes to ascertain if wire-tap evidence was introduced. If it is found they intend to move to enjoin its further use by application, as one says, “in the proper court”, and, as the other says, “in Federal District Court”. Needless to say, their hopes for success in the intended injunction proceedings would be pinned on the Pugach case — primarily on the argument that because it has been stayed all other actions should be, but ultimately on the expectation that the Supreme Court of the United States in its pending decision will apply the exclusionary rule to State trials.
Let us assume that wire-tap evidence was introduced in the Grand Jury on the founding of these indictments. Granted this, does the stay in the Pugach case and the most rose-colored hopes for success in the United States Supreme Court warrant-inspection of the Grand Jury minutes? We think not.
A prerequisite to inspection of the minutes is the intention of the defendant to move to set the indictment aside ‘ ‘ because he believes that his constitutional rights have been invaded by the reception of illegal evidence before the grand jury to such an extent as to invalidate the indictment and that the legal evidence is insufficient to warrant the finding of the indictment ’ ’, (People v. Lyndaker, 116 N. Y. S. 2d 195, 196, citing People v. Glen, 173 N. Y. 395 and People v. Kramer, 151 Misc. 210.) Because the defendants have signified their intention to move to set the indictments aside, we need only consider whether wire-tap evidence is illegal. Clearly, at this moment in time, it is not (People v. Stemmer; Schwartz v. Texas; People v. Variano; all above cited). The fact that it may, at some future time, be declared to have been illegal is not material to the type of relief sought here.
Police must act quickly to hold a lawbreaker; the courts must act judiciously to protect his rights, and the judicial process is time .consuming. Grand Juries must act on the facts presented by police. They cannot pigeonhole the facts awaiting the law that might be; they must act on the law that is. By the same token, a court reviewing the legality of evidence taken by a Grand Jury must consider the law as it is, and not what it may become. Should their hopes for the Pugach case be ultimately fulfilled, defendants have appropriate remedies.
The court, therefore, must deny each of the defendants’ motions unless the grounds otherwise presented are sufficient for granting it.
*1055 AS TO THE MOTION OF THE DEFENDANT NAPLES :
Naples was indicted on nine counts charging violation of section 970 of the Penal Law (common gambler) and nine counts charging violations of section 974 of the Penal Law (keeping a place for the game of policy), running over nine days which were consecutive, not counting a Sunday.
The defendant was the owner and operator of a cigar store on the premises mentioned in the indictment. He employed John Moffitt and Marge Armstrong. John Moffitt, according to defendant’s attorney’s affidavit, testified as follows to the Grand Jury: that he could not identify certain handwriting (presumably on policy slips) exhibited to him; that from time to time he would receive a call from an unidentified person who would recite a number which he would write on a slip of paper; that whenever anyone inquired, either in person or by telephone, what the number was, he would either show it or tell it.
According to the same source, Marge Armstrong testified that she sold policy slips and rang the receipts up on the cash register; that she identified for the Grand Jury her own handwriting on some policy slips and the handwriting of the defendant on others.
Obviously John Moffitt and Marge Armstrong were accomplices whose testimony alone would not constitute legal evidence sufficient to sustain a conviction and on which, standing alone, inspection of the minutes would be ordered (People v. Dally, 174 Misc. 830 and the cases therein cited). Corroboration by other evidence tending to connect the defendant with the crime is required (Code Crim. Pro., § 399).
We believe the presence of such other evidence before the Grand Jury is indicated expressly and by inference in defendant’s attorney’s affidavit. It recites that a Virgil Jones testified to the Grand Jury that on May 13, 1960 (one of the nine consecutive days) he obtained a policy slip from the defendant at his cigar store. The presence of the policy slips themselves before the Grand Jury coupled with the logical inference that their place of origin must have been identified is also such other evidence, especially in view of the fact that defendant’s attorney’s affidavit does not deny the defendant’s possession of them.
The defendant Naples’ motion to inspect the minutes of the Grand Jury must be denied.
AS TO THE MOTION OF THE DEFENDANT GAEN :
The 10 defendants named in this indictment are all charged with violations on three counts: section 580 of the Penal Law (conspiracy); section 1372 of the Penal Law (contriving, draw *1056 ing and assisting in a lottery) and section 974 of the Penal Law (keeping a place for game of policy). The second and third counts are blanket charges covering all the defendants, set forth in the statutory form, without specification for any particular defendant. The specifies of these charges may be readily seen however in a reading of the first count since, therein, 64 overt acts of conspiracy are alleged. Each of the overt acts alleged directs itself to the activities of a particular defendant. The defendant Garn is mentioned in two of them — 62 and 63.
Overt acts 1 through 61 detail a policy operation in which all of the defendants except Garn are alleged to have played a greater or lesser part. Garn’s overt acts of conspiracy and his part in the policy operation are alleged in the following words:
‘ ‘ 62. On or about March 6, 1960 in the City of Syracuse said Francis Garn revealed to said Alice Harris (a defendant) information concerning the police investigation in connection with the arrest of said George Lennon, Jr. (a defendant) upon lottery charges.
‘ ‘ 63. On or about March 9, 1960 in the City of Syracuse said Francis Garn revealed to said Alice Harris information concerning the police investigation in connection with the arrest of said John Redick (a defendant) upon lottery charges.” (Matter in parenthesis supplied.)
The fact that after .Redick and Lennon were arrested, Garn gave information to Alice Harris concerning the investigation leading to their arrest, while perhaps injudicious, is meaningless here unless it was an act done to promote the policy operation (Penal Law, § 583).
The affidavit of defendant’s counsel states: that Garn testified before the Grand Jury (under a waiver of immunity); that he there listened to recordings of telephone conversations between himself and Alice Harris; that the conversations were innocent in nature; that two of them sought information from him concerning Lennon and Redick who had been arrested some days before; that he was questioned by two Assistant District Attorneys in relays without respite; that he was ordered by the foreman to answer questions with a simple yes or no without being given an opportunity to explain where explanation was necessary; that defendant’s counsel has made reasonable effort to determine if there was other evidence in front of the Grand Jury respecting Garn without success; that he surmises that the above constitutes the only testimony on which he was indicted.
It is important to note that the opposing affidavit refutes none of these allegations, but is devoted mainly to refutation of *1057 matters that concededly did not take place in front of the Grand Jury.
An innocent act, unconnected with the promotion of the object of the conspiracy, would be legally insufficient to hold the actor, even if carried on with a conspirator. (See People v. Laman, 273 App. Div. 377, affd. sub nom. People v. Henderson, 298 N. Y. 462.) In this connection, overt act 64 alleges monthly rentals paid by Alice Harris for the policy premises to her landlord. Yet the landlord was not indicted. His actions from the face of the papers before the court seem to lie in the same category as Garn’s.
Of course any evidence obtained by the Grand Jury under the duress of excessive browbeating would be illegal.
Defendant Garn’s motion to inspect the minutes of the Grand Jury is granted.
Since the Grand Jury has been in session seven months and has accumulated many volumes of testimony in this and other matters the court will permit the District Attorney to provide for Garn’s inspection his entire testimony together with all other testimony which the District Attorney will claim is sufficient to sustain the indictment against him.